## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | CRIMINAL NO. 08-cr-245-LSC-PWG |
| | ) | |
| WILLIAM B. BLOUNT | ) | |
| | ) | |
| Defendant. | ) | |

### SENTENCING MEMORANDUM OF BILL BLOUNT

Bill Blount will come before this Court on Friday, February 26, 2010 for sentencing.  The recent United States Supreme Court cases of *Gall* and *Kimbrough* emphasize the broad discretion this Court has in sentencing. The Supreme Court recognized that trial courts have more knowledge than appellate courts do, not only about the individual case, but about sentences in many other cases that appellate courts never review.  In exercising its discretion in determining an appropriate sentence, the Court is governed by four overriding principles:

1). this Court is to impose a reasonable sentence;[1]

2). the Federal Sentencing Guidelines must be considered but are just one of a number of sentencing factors set forth in 18 U.S.C. 3553(a);

3). the primary directive in §3553 is to select a sentence which is "sufficient, but not greater than necessary," 18 U.S.C. § 3553(b); and

4). finally, this Court is directed to "[recognize] that imprisonment is not an appropriate

---

[1] *United States v. Booker*, 125 S. Ct. 738 (2005).

means of promoting correction and rehabilitation." 18 U.S.C. 3582(a).

## §3553  FACTORS TO BE CONSIDERED BY THE COURT

18 U.S.C. § 3553(a) enumerates seven factors to be considered by this Court in its imposition of a sufficient but not greater than necessary sentence. The Court is well familiar with each of these factors. They will be addressed below, in the order set forth in the statute.

1. **The Nature and Circumstances of the Offense and the History and Characteristics of the Offender-18 U.S.C. § 3553(a)(1)**

The serious nature and circumstances of the offense are set forth sufficiently in the PSR and well known to the Court. However, the Court may not be as familiar with Bill Blount's history and characteristics. It is an awesome and difficult task to summarize a lifetime of a man within the confines of a twenty page memorandum. Especially, in the instant case, where the life lived is so at odds with the snapshot that has been presented to this Court of admitted-to criminal conduct. The letters attached hereto are submitted in an effort to give the Court a glimpse of Bill Blount, the man, by those who know him best. The exercise is not only beneficial to the Court and necessary to render an appropriate sentence but also mandated. The United States Supreme Court has directed sentencing courts to:

> **consider every convicted person as an individual**, and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue

remaining mindful that a sentence of imprisonment

> may work to promote not respect, but derision, of the law, if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.

*Gall v. United States*, 128 S.Ct. 586, 598-99 (2007) (citations omitted).

2

### A.  William B. Blount Background: Childhood

Bill Blount was born to Joe and Martha Mae Blount on September 22, 1953 and raised in Troy, Alabama.  He has three sisters (Martha Jo Blount, Carol Ann Goff and Jane Cash) who have each written letters on his behalf seeking leniency and mercy.  Their father worked sporadically, ranging from selling hardware, to working on a beer truck, to selling insurance.  He was a benign alcoholic, who gave up drinking and smoking while Bill was in law school.  Bill's dad died in 2000 of colon cancer.

Bill had a strong work ethic even as a youth.  He delivered papers from the time he was in the 3rd grade until high school, often having two routes requiring him to get up at 4:30 a.m.  He worked summers for the City of Troy collecting trash.  Bill's  mother worked as a seamstress and with Bill as a co-guarantor, went to the bank when he was 12, and borrowed enough to open a fabric shop, which she owned and operated for 25 years.  Martha Mae Blount was the strength of the family and Bill is still very close to her today.  She is 90 and a stalwart member of the First United Methodist Church in Troy.  Bill drives down at least once a month to take her to church and lunch.  He provides other means of support and love to her.  All of the children worked during high school and college and contributed their earnings to the well being of the family.

Bill was an athlete in high school, lettering in football and track and field.  Bill was active in Key Club, a young men's service organization sponsored by the Kiwanis Clubs.  He served as Governor of the Alabama District Key Club his senior year in high school, along with being president of his senior class.  "In the late 60's, he became the high school spokesperson to help ease the racial tension.  Although it wasn't a popular cause, Bill stood for his principles."  [Carol

Blount Goff][2]   Even in high school Bill helped "clubs and individuals around the State giving generously of his time and leadership skills." [Michael K. Hudson]  He was also an excellent student gathering salutatorian honors upon graduation.

### B.  College

Bill's family was unable to pay for him to go to college.  However, he achieved a sufficient score on the ACT to obtain a full scholarship to the University of Alabama in 1971. He joined a fraternity which gave him jobs so that he could pay his house and food bill.  He was active in Student Government serving in several roles before being elected President his senior year, 1974-1975.  Bill finished undergraduate school a semester early and worked for the National Alumni Association and as a speechwriter for Dr. David Mathews.

He started  law school in the fall of 1975 and while there, continued to work, including in the Tuscaloosa County District Attorney's office for Lou Lackey and Wayne Williams, and Ryan deGraffenreid.  He was also an adjunct faculty member at Shelton State teaching Business Law and History.  He worked for the Law School Foundation as a field representative and fund-raiser. He was also on the John A. Campbell Moot Court Board.  Bill has always had to work to help his family, but also to pay his tuition, fees, rent, student loans, and other ancillary items that go with being a student for seven years.

Bill was very close to an outstanding history professor in college, John Ramsey, who also sponsored Jasons, the senior men's honorary.  Dr. Ramsey retired while Bill was in law school and Bill and other confidants of Dr. Ramsey started a scholarship in his name that is currently–30

---

[2] Bracketed names such as [Carol Blount Goff]  indicate the person's letter which is the source of the quote or comment.

years later– the top scholarship for a junior at the University of Alabama.[3]

## C.  Post-Graduation

Bill graduated from law school a semester early, took the bar exam in February and helped manage the Howell Heflin for U.S. Senate campaign.  (Senator Heflin's son Tom had been Bill's high school friend and college and law school roommate.)  After the campaign, Bill married Nancy (Wilson) and moved to England where he did post graduate at the University of London and clerked for the solicitor's firm of Burton Yeates and Hart.  He returned to Montgomery in June of 1979, when he was asked to join the Fob James administration as assistant legal advisor, but in reality, to run the legislative effort for a new Constitution.  He agreed to do so, going to work for Gov. James until August of 1979, when the Governor abandoned efforts to pass a new constitution.  Bill was Vice President of the University of Alabama National Alumni Association from 1980-1981.

## D.  Investment Banking Business

Bill then went to work for an investment banking firm in Montgomery, Thornton Farish and Gauntt.  He remained in the investment banking business from thereon.  Bob Geddie succinctly summarizes Blount's business career in his letter to the Court:

> From a business standpoint, Bill has a tremendous work ethic.  He has built a very successful investment banking firm with a regional presence and his firm has assisted scores of small and medium-size businesses and public entities through the public capital markets and many of these companies and public entities have grown to rely on his advice and counsel.
>
> He has advised numerous governmental entities and has been a resource on a variety of financial questions.  As an example, it was his idea to establish both the

---

[3]  Bill "was [also] the driving force behind the Samford Scholarship, which is given to an Auburn University outstanding junior." [Lucinda Samford Canon]

5

Alabama Trust Fund (from the oil lease windfall funds) and the Higher Education
Loan Authority, which established higher education loans for qualified college
aspirants well before the PACT fund was established.  Both of these were put in
place during the first Fob James Administration, in which I served.

The City of Montgomery may be the largest municipality in the country with two
cable companies competing for customers.  In 1990, Bill started a new cable
company to compete with the existing company and Montgomery residents saw
tremendous improvement in both rates and service.

Blount was the originator of a unique financing technique that accessed public tax
–exempt debt markets for Waste Companies.  He built the Alabama Magazine (now Business
Alabama) from a quiet 5,000 subscriber's magazine to 20,000 subscribers. He built an
investment banking firm from scratch to one of the largest and respected firms in the Southeast.
He was in the second Leadership Alabama Class and in 1981 was named one of the top 40
business people in Alabama under 40.  He bought and sold radio networks, (ALANET) telephone
companies (Commsource), cable companies, and waste companies.

Bill's wisdom, insight and advice benefitted not only individual investors but cities and
the State as a whole.  Bill has given "help to  many communities in this state providing improved
government facilities such as utilities, schools and public buildings."  [James S. Holbrook]
Troy's Mayor of 28 years, Jimmy Lunsford writes: "The selection of Bill Blount in the early 80's
for our financial advisor has proven to be a great decision.  The City now carries an 'A' rating
with a $16,000,000 trust fund.  Most of this is due to Bill's professional expertise.  During this
long tenure, there never been even a hint of impropriety."  In addition, as the City of Brewton's
financial consultant he "was instrumental in helping Brewton obtain its first credit rating.  At that
time, [Brewton] was the first city of [its] size to obtain such a rating in this State."  [Ted

6

Jennings, Brewton][4]  Blount worked with Alabama State University in underwriting bonds "when the University was facing some financial challenges; Mr. Blount worked indefatigably in many cases without pay to assist the University in extracting itself from this unforeseen circumstance." [Freddie Gallot, Jr., Vice President for Business and Finance at ASU].  Blount was instrumental in helping build the Jimmy Samford Stadium at Huntingdon College and raising money for seminary students that came from poor backgrounds. [Dr. Karl Stegall] Environmental lawyer, Bart Slawson wrote that Bill has "helped us solve our landfill bond problems, he vetted various financial proposals and I'm sure saved us from many bad moves during that period of time.  He did most of this work at no cost whatsoever to our firm.  He was never inappropriate or dishonest.  I know Bill has helped out many small local governments with various environmental problems without any thought of compensation."

One of the most telling indicators of the manner in which Blount conducted himself in the business world, is that several of Blount's business and political rivals, who he has competed against for over 30 years have written letters on his behalf.  These men each speak of his business acumen and integrity.  Thomas Ashley Harris, Chairman of Merchant Capital, LLC wrote: "There have been some misjudgments along the way, but I could never have imagined that anything like this would have occurred.  My work alongside Bill, when our firms worked together, was always straight forward, professional and appropriate."  Robert H. Young, Jr., President of The Frazer Lanier Company wrote: "While we have been competitors since 1978, I have always had a warm feeling for Bill.  We worked on several issues (through the years)

---

[4] Mayor Jennings goes on in his letter to state that: "Over the years, Bill has always conducted himself with the highest integrity and ethical standards."

together and my observation is he always did what was in the best interest of our client." James S. Holbrook, Jr. Chairman and CEO of Sterne Agee wrote: "It is my humble opinion that Mr. Blount is not someone who requires rehabilitation and that society would not be served by excessive punishment. I believe that Mr. Blount's actions were a very serious mistake in judgment and that he is not a danger to society." A self described "political adversary for at least 25 years", Jack Campbell added: "I saw Bill during Christmas break, and this situation obviously weighs on him. In my gut, I sensed that he is very sorry for this entire episode. Having said that, I truly do not believe jail time is necessary for him to realize his mistakes."

In summary, Bill "is an extremely gifted banker with an excellent work ethic and is acknowledged as one of the leading bankers in the industry." [John H. Gray] He is a "real leader and a man of fine character." [Mike Reilly] His "professional activities served as a catalyst for economic development, expansion of education facilities, and making his community a better place to work and play." [David Corbin]

### E. Bill Blount and His Family

Bill is also a family man. He married Nancy Wilson Blount in 1978. They had two son's: Jesse (20) and Wilson (21). Joe Espy, a friend of Bill's for over 25 years noted that Bill is a good father. Joe further noted, that when Bill and Nancy divorced, the boys initially lived with his ex-wife but when they reached sufficient age, elected to live with Bill. Bill's close friend of 40 years, Tom DeBray, gave a picture of Bill's relationship with boys and family when he wrote:

> I know Bill to be a loving and devoted father. His two sons and my children grew up together, and during that time I had the opportunity to witness Bill's devotion to his boys. I know personally that both of those young men need Bill in their lives as they make their way through college and into early adulthood.
>
> I am also close to Bill's family, most of whom live and work in Alabama. His

8

mother is truly a saint, and has been a fixture at the First United Methodist Church of Troy for many decades.  Bill was raised in that church, and he continues to attend services there on a regular basis.  He has three sisters and numerous nephews and nieces, all of whom find support from Bill in one form or another.  Bill's family and particularly his elderly mother, need Bill to continue to be an active part of their lives.

You cannot simply look at the traditionally defined family when you look at Bill's "family".  "Bill is the type of parent whom other children seek out and trust.  Bill often knew more about what was going on in other children's lives than their parents did."  [Lee Copeland] Bill took a close friend's sons into his family after the friend died.  [Steve Flowers]  LuAn Eddings wrote that "unfortunately, Frank [my husband] died unexpectedly eight years ago.... During these ['very formative years']   Bill has given generously of his time to Frank and Marshall.  He has opened not only his heart but also his home to them.  In essence, Bill has been a surrogate father to my boys providing advice, counseling and at times needed discipline.  I will be forever grateful for the positive impact Bill has had on our lives."

One of the things that stands out about Bill is that not only has he accepted responsibility publicly and with this Court for his criminal conduct.  He has done so privately and with his family.  "Through all this, Bill continues to tell his sons one thing–be accountable for your actions, as he will be for his."  [Fred Brown]  As Bill faces sentencing, and a certain prison term, the sentence of this Court hands down will be a lesson to all those within the realm of Bill's influence.  But a lengthy prison sentence is not necessary for this lesson to be taught.  The Federal Sentencing Guidelines recognize that a short prison sentence "will serve as a significant deterrent."  USSG, Ch.1, Pt.A(4)(d)  The sentence of this Court should be tempered with leniency and mercy, so that Bill is able to return to his family and extended family and continue to be a positive influence in their lives.

9

### F. Bill Blount and Community/Charitable Involvement

"Bill has always been willing to help others succeed in their lives and professions, unselfishly." [Steve Flowers]  Bill has been actively and extensively involved in community and charitable activities. He contributed and solicited funds for the Montgomery Museum of Fine Arts; the Alabama Shakespeare Festival; the John Ramsey Foundation, and served on the Administrative Board of the First United Methodist Church of Montgomery (where he has been an active member for 30 years).  He chaired the capital campaign drive for the Sigma Nu fraternity at the University of Alabama from 2005 through its completion in 2007.  Bill was the original Montgomery representative on the statewide Board for Magic Moments Foundation (the Alabama version of Make-a-Wish).

Lucinda Samford Cannon describes how her brother, Jimmy Samford and Blount were best friends and business partners.  "Their friendship lasted until Jimmy's untimely death in December of 2003."  Jimmy appointed Lucinda and Bill as co-personal representatives of his estate.  As a result the W. James Samford, Jr. Foundation was formed and funded in excess of $8 million.  Since its formation Bill has overseen distributions of over $1.4 million to more than 48 different 501(c)(3) charitable organizations.  In addition, Bill, through this foundation, developed the Philanthropy 101 program, which:

> takes a group of high school students and pays them for six weeks of work.  The 'work' consists of learning about different charitable groups in Montgomery....
> Each day, they would (for about eight hours) visit and learn about a single charity.
> At the end of the program, each student would give an oral presentation concerning a particular charity that they identified with.  The children would then donate a portion of the money that they had been paid to that charity.[5]  The

---

[5] They must give away at least $1,000 of the $1,700 they are "paid" by the Samford Foundation at the beginning of the course.

theory–and the theory is working–is that these children will continue in their
charitable endeavors throughout their lives.  It is a great concept and one that is
alive in Montgomery because of Bill's original insistence to start and support the
program.  [Lee Copeland, Esq.]

The program also operates in the Auburn-Opelika area.  At the end of the course,  Lucinda Canon

states, "[t]hese students are awakened to people who have serious needs.  They learn how to meet

these needs with hands-on service as well as financial contributions."  Michael Bownes' daughter

participated in the Philanthropy 101 program and he described it as "a life-changing experience

spending the summer working at charities and non-profit organizations."

In summary, Bill "through his persuasiveness, has accomplished a great deal of good for

struggling single mothers, grieving children who have lost their parents, wayward children with

detached parents, the disabled and unemployed, students in search of higher education, and

people in need of medical attention ranging from head trauma to cancer, just to name a few.  His

absence from the foundation and from his own personal prerogatives outside the foundation will

have a negative impact on the people in society who are most in need because it is for them that

his philanthropic efforts are aimed." [E. Rasha Cannon]

Other acts of kindness and charity that are indicative of Bill's character include:

- arranging and paying for a flight to St. Jude's Hospital of a young girl dying from cancer; [Richard Meadows]
- financially assisting a friend with a health problem; [Richard Meadows]
- making anonymous donations to help underprivileged and at-risk youth in schools and youth facilities; [Frances McGowin]
- escorting and chaperoning children from government housing to events and paying for them to attend; contributions to tutoring programs, feeding the underprivileged during Thanksgiving and programs that work with disabled children; [Frances McGowin]
- being consistent contributor to Alabama State University's endowment;  [Freddie Gallot, Jr.]
- helping a young man, who got in trouble with the law, get his life straightened out. [Wayne Greenhaw]

- raising millions of dollars to refurbish the Sigma Nu House at the University of Alabama. [Robert C. Scroggins, Sr.]
- purchasing hearing aids for a co-worker; [Jane Blount Cash]
- helping his hometown hospital secure funds that enable them to continue operating as a hospital. [Steve Flowers]
- anonymously paying for equipment, uniforms, lodging and meals for many of these youths in Montgomery youth city leagues who could not afford the financial burden.  [Fred Brown]
- working with a friend's son who has serious learning disabilities; [Robert Bruce Rinehart]

The list could go on and on.  As Dr. Arthur Steineker observed: "I have had the opportunity over the past thirty-four years to observe numerous acts of kindness on his part.  It always struck me as revealing that Bill generally reached out to help those in bad times, and most of those he helped could never do any favor in return.  I say this to observe that Bill has developed a life long legacy of compassion and generosity that has clearly been tarnished in recent months." [Arthur Steineker, DMD]  Rasha Cannon stated:  "Bill gives from his left hand without telling his right.  I cannot point to monuments he has bought in his own honor as examples of his generosity–that is not his way.  I can only witness to what I've seen him do and heard him say, and I know therefrom that he encourages compassion for others for the sake of the heart, not for status or credit."  Bill's generosity to the community will be missed for whatever period of time this Court determines.

2. **The Need for the Sentence Imposed to Promote Certain Statutory Objectives-18 U.S.C. § 3553(a)(2)**

**(A) The Seriousness of the Offense**

The facts to which Bill Blount has pled guilty are readily apparent in the record, not only from his plea hearing but also, from his trial testimony.  No one disputes this is a serious offense.  What is not in the record is the punishment Blount has already incurred and the depth of his

12

remorse.  Prison time is just one element of "punishment".  In fact, the United States Supreme

Court has made it clear in *Gall*, that the collateral consequences of a criminal conviction, even

without any prison time, constitute significant punishment by themselves.  Therefore, in

fashioning a "sufficient but not greater than necessary" punishment to fit the offense, this Court

must consider the punishment that Bill Blount has already suffered.

"From arrest to reentry into the community, a web of sanctions haunts defendants and

their families.  An arrest and criminal charge alone can have a devastating impact.... These

hidden sanctions can have a more severe impact on the arrested or convicted, their children, and

their families than the immediate criminal sentence." 36 *University Toledo Law Review* 479,

481-482.  As with all persons convicted of a felony, Blount has lost the right to vote, to serve on

a jury, and to own a firearm.   The Eleventh Circuit has made it clear that these deprivations

incurred by a defendant should not be taken lightly by the Court.  (See, *U.S. v. Stone,* 139 F.3d

822, 831 (C.A.11 (Fla.),1998) (holding "It is a serious matter, obviously, to deprive an American

citizen of civil rights as important as the right to vote, the right to keep and bear arms, and the

right to engage in a chosen business or profession.")

Moreover, Bill Blount's career has been adversely, substantially and permanently

affected.  He has **voluntarily surrendered** both his law and securities licenses.  He business has,

effectively, been shut down.  He has had virtually no earned income since the indictment and his

reputation in the business world has been destroyed, which is life blood of an investment banker.

While his source of income has evaporated, his debts remain.  Including the $1 million he has

agreed to forfeit to the United States.  In his efforts to satisfy this obligation, Bill sold his

13

residence, turning the proceeds over to the Marshal's office.[6]  Even before this Court announces

its sentence, Bill Blount has been punished through the financial effects of this indictment, trial,

conviction and associated publicity.   For the past year Bill Blount has lived in a jail without bars

and each of these elements of punishment will continue to follow him for the rest of his life,

regardless of the sentence imposed by this Court.  This is sufficient punishment under the

circumstances of this case.

  The people that know Bill best have described the punishment he has already incurred:

- "Bill has suffered tremendously because of his actions.  Bill's reputation has been tarnished, his family has suffered immensely as a result of his actions and his ability to provide for his family in the future has been severely impaired." [Hon. J. Lee McPhearson]

- "...I called Bill when his plea was revealed to suggest he voluntarily surrender his law license without the bar having to take disbarment action.  Bill's humility and appreciation of my suggestion and how immediately he took the initiative to complete a surrender in the shortest time I can recall, was evidence to me of his willingness to begin his payment of his debt to society." [Reginald T. Hamner]

- Bill has surrendered not only his law license but also his securities license.  [Dr. R. Lawson Bryan]

- "He fears he has sullied the family name.  He fears he has lost respect of his family.  He knows he has lost friends, support and business.  Oh, he is aware of the ramifications of the offenses with which he is charged.  He will pay for those for years, certainly post incarceration." [M. Jo Blount–Bill's sister]

- "He has lost a successful business that he helped build from the ground up and he's lost most of the fruits of his labor as well." [Steven Louis Reed]

- "Bill has suffered greatly and is very sorry for the mistakes that he has made.  His family has suffered....  I know Bill personally and he is very sorry for the damage that he has caused and the pain and suffering he has caused all that have been involved in the decisions that he has made." [Mike Reilly]

---

[6] See, Appendix Section I(A).

- "Bill has already begun to pay a price and continues to pay it daily.  He has been publicly humiliated, his business is no longer viable, he will be locked up in prison and will pay a large fine.  When he finally gets out, it will take a long time for him to get his life back together, if at all possible." [Fred Brown]

- "Bill's entire career and in fact, fulfillment of his life's mission, depended on the public perception of his character.  He could not suffer a more enduring punishment than the tarnishing of his reputation." [David Corbin]

Before the gavel drops on Bill's sentence, he has already suffered serious punishment, and will for the rest of his life, even without a term of imprisonment.

### (B) Adequate Deterrence

As noted above, a long sentence is not required to be a significant deterrent.  Other professionals similarly situated will be deterred by the consequences outlined above, including the loss of licenses, business, livelihood and forfeited property.  This is consistent with the Senate Report addressing the Federal Sentencing Guidelines which specifically noted certain "better alternatives" to imprisonment include forfeiting large amounts of money which would "provide punishment and deterrence to major offenders … (by stripping them) … of the "amount … gained by committing the offense"....   S. Rep. 98-225, at 39, 1984 U.S.C.C.A.N. 3182, 3222 (1983).[7]

In accessing the statutory objectives, this Court is directed to "[recognize] that imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. 3582(a).  Further, as Justice Anthony Kennedy noted at the ABA annual meeting on August 8, 2003:  "Our resources are misspent, our punishments too severe, our sentences too long." *The American Way of Punishment: The ABA Justice Kennedy Commission Report*, The Champion

---

[7] See Appendix Section I(B).

(December 2004 p. 36).  Research has shown the negative effects of over-incarceration.
Sentencing Project, *Incarceration and Crime: A Complex Relationship* 7-8 (2005) ("The rapid
growth of  incarceration has had profoundly disruptive effects that radiate into other spheres of
society.  The persistent removal of persons from the community to prison and their eventual
return has a destabilizing effect that has been demonstrated to fray family and community bonds,
and contribute to an increase in recidivism and future criminality.")[8]

This Court can hand down a reasonable sentence for this serious but non-violent, first
offense exactly as Congress intended: by creatively fashioning a sentence to include a minimal
term of imprisonment, a substantial forfeiture and supervised release, thus combining
rehabilitation with deterrence and punishment.

### (C).  Protect the Public from the Defendant

There is no need to protect the public from this Defendant.  As shown, both above and
below, Blount is no threat to ever commit criminal conduct again.

### (D).  Training, Medical Care and Correctional Treatment[9]


### 3.  The Kinds of Sentences Available-18 U.S.C. §3553(a)(3)

Any reasonable sentence may be imposed by this Court.  Since Booker, no provision of
the guidelines is mandatory. For instance, the restrictions in U.S.S.G. § 5C1.1(f) with respect to
the components of any sentence and limits on probation imposed by Zone D, like all other
provisions of the guidelines are advisory only. See *United States v. Anderson*, 365 F. Supp. 2d 67

---

[8] Available at http://www.sentencingproject.org/pdfs/incarceration-crime.pdf.

[9] See Appendix § II.

(D. Me. 2005) (imposing split sentence in case that would have required straight imprisonment under the zones in §5C1.1); see also United States v. Winters, 411 F.3d 967, 972 (8th Cir. 2005) ("We find no support for [the] argument that portions of the sentencing guidelines remain mandatory after Booker"). Moreover, none of the offenses of which Bill Blount pled guilty preclude the imposition of a sentence of probation. Thus, that and any other sentence would be available to the Court, provided it is reasonable. Hence, there are no limitations on this Court's discretion to impose a sentence that includes a minimal period of imprisonment.

The Guidelines as calculated by the U.S. Probation Office reach a total offense level of 37. Under the joint objections as submitted by the Government, LaPierre and Blount, the appropriate total offense level is 35. (Document 202) These Guidelines are advisory as noted herein. Statutorily, the maximum term of imprisonment under the two counts are: five years for conspiracy and ten years for bribery. Under the plea agreement, subject to this Court's approval, the parties have agreed that the sentences on the two counts will be run concurrently and, if the Government files a rules a §5K1.1 motion, that the appropriate sentence is 52 months.

A common theme of the letters submitted to the Court are the resounding pleas for leniency and mercy. A sampling of those letters include the following:

- "It is my opinion that Bill should receive leniency and mercy in this case and I feel that he will not need any rehabilitation or excessive punishment in his case." [Steve Flowers]

- "Being a friend of his, a citizen of this community, and a proud countryman; I appeal to your great wisdom and request that a minimum sentence of incarceration as possible with a lengthy community service be considered." [Thomas A. Harris]

- "An extended period of incarceration would not benefit society, as I believe the legal process has effectively deterred Bill from such actions in the future." [Arthur Steineker, DMD]

17

4.  **The Advisory Federal Sentencing Guidelines and Any Pertinent Policy Statement-18 U.S.C. §3553(a)(4-5)**

      **A.  Federal Sentencing Guidelines**

As this Court is well familiar, post-*Booker*, the sentencing guidelines and their applicable commentary are now advisory.  The advisory guidelines have been calculated and set forth in the PSR, with Joint Objections being filed by the Government, Blount and LaPierre.  The Eleventh Circuit invokes no "presumption" that this advisory Guideline sentence is reasonable.  Although they must be calculated for each defendant, their application is merely one of the statutory factors set forth in 18 U.S.C. § 3553(a) that a sentencing court must consider when imposing sentence.  *United States v. Crawford,* 407 F.3d 1174 (11th Cir. 2005).    Again, the United States Code's primary directive to a sentencing court is to determine a sentence which is "sufficient, but not greater than necessary," to accomplish the various legitimate purposes of punishment.  18 U.S.C. § 3553(b).

      **B.  Pertinent Policy Statements**

While the PSR addresses the Guideline range, it does not address several pertinent policy statements and studies of the Sentencing Commission.  All of these indicate that Bill Blount is extremely unlikely to commit additional crimes.  The United States Sentencing Commission, as shown below, has conducted studies which demonstrate that persons within Blount's age group, criminal history category, and crime of offense, are unlikely to commit additional crimes.  Not only do these studies show that Blount is unlikely to become involved in any other criminal activities, the supporting letters previously submitted contain the firm convictions of the persons who know him best that such is the case.  This is further corroborated by Blount's exemplary

conduct since the indictment and while he has been released.

### 1. Recidivism

In *Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines*, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate (May 2004)[10] the following findings were made which should be considered by this Court:

- Recidivism rates decline relatively consistently as age increases, from 35.5% under age 21 to 9.5% over age 50.  *Id.* at 12.  Bill Blount is 56 years old.

- Stable employment in the year prior to arrest is associated with a lower rate of recidivism.  *Id.* at 12.  Bill Blount has worked for the same entity since February of 1986.

- Recidivism rates decrease with educational level.  *Id.* at 12.  Bill Blount has both college and graduate degrees.

- The Guidelines Offense Level is not a predictor of recidivism.  *Id.* at 13.

### 2. First Offender

In *Recidivism and the "First Offender"*, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate (May 2004)[11] the following findings were made which should be considered by this Court:

- Recidivism risk ... is lowest for offenders with the least experience in the criminal justice system.  *Id.* at 12.

- finding that white collar defendants with no prior criminal history have virtually negligible recidivism rates.  *Id.* at 12.  Bill Blount is in a criminal history category

---

[10] Available at: http://www.ussc.gov/publicat/Recidivism_General.pdf

[11] Available at: http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf

1.  The only blemish on his criminal record is a twelve year old DUI.

### 3.  Short Prison Sentences Serve as a Significant Deterrent

In the *United States Sentencing Commission, Report to the Congress, Downward Departures from the Federal Sentencing Guidelines*, at A-32 (2003), the Commission offered its view that prison sentences should be short in duration because "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes."

### 4.  Guideline Loss Calculations are not the Result of Empirical Study

The loss table at §2B1.1 which drives Blount's Guidelines calculations has not been promulgated in accordance with the Sentencing Commission's traditional role and expertise. Instead, it has been forced upon the Commission by Congress and thus is entitled to lesser deference.[12]  In *United States Sentencing Commission, Fifteen Years of Guidelines Sentencing*, at 56 (2003), the Commission stated: "over the years, additional aggravating adjustments were added to the theft and fraud guidelines often in response to congressional directives."  The Report quoted a former commissioner as warning "that the [Sentencing Reform Act's] promise of policy development through expert research was being supplanted by signal sending by Congress."  And that in the wake of corporate scandals of 2002, the guidelines were again amended "at the direction of Congress".

Each of these forgoing policy statements of the Sentencing Commission should be

---

[12]   *Kimbrough* discussed the fact that the Sentencing Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience guided by a professional staff with appropriate expertise.'" *Kimbrough,* 128 S. Ct. at 574; *see also Gall,* 128 S. Ct. at 594 n. 2 (noting that not all guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions").

considered by this Court and each demonstrate that a short prison sentence would be sufficient to serve the purposes of society.

### 5. __The Need to Avoid Unwarranted Sentence Disparities-18 U.S.C. §3553(a)(6)__

The only related case is *United States v. Mary Buckelew*, 2:08-CR-357-IPJ-HGD.  Mrs. Buckelew received 36 months of probation, a $20,000 fine and a $100 assessment fee.

### 6. __The Need to Provide Restitution to Any Victims-18 U.S.C. §3553(a)(7)__

No restitution is owed by Blount as a result of his conduct.  First, Blount has agreed to forfeit $1 million.  Any order of restitution would impair and impede his ability to pay this amount.  Secondly, there is no identifiable victim who has suffered a physical injury or pecuniary loss. 18 U.S.C. §3663(a)(1)(A)[13]  In the alternative, the number of identifiable victims is so large as to make restitution impracticable.  USSG §5E1.1(b)(2)(A)  Finally, an order of restitution would require determination of complex fact issues which would complicate or prolong the sentencing process to a degree that it is outweighed by the burden on the sentencing process. USSG §5E1.1(b)(2)(B)

### __Other Factors to be Considered by the Court__

### A.  Bill Blount's Guilt and Remorse

While not listed as a sentencing factor under §3553, an important consideration for the Court and society is the remorse of the defendant.   Accompanying Blount's acceptance of responsibility is his heartfelt remorse, which he not only possesses, but which has been

---

[13] §3663(a)(2) defines a "victim" as "a person directly and proximately harmed as a result of the commission of an offense...." Further, the burden of proof is on the Government.  18 USC §3664(e).  And there must be a direct link between the charged offense and the loss to the victim. *United States v. Ledesma,* 60 F.3d 750 (11th Cir. 1995).

universally observed by or expressed to those closest to him.  Bill Blount's friends,

acquaintances, business associates and competitors have noted the following:

- "Over the past year, I have spoken with Bill many times, not as a Mayor, but as a personal friend concerning his spirits, demeanor and attitude.  He has expressed **deep remorse for his actions**." [Brewton Mayor–Ted Jennings]

- "Over the last several months, I have personally seen what Bill has endured and have observed his **remorse and sorrow for what he did.  He has never made any excuse nor has he tried to blame anyone else.  He has accepted full responsibility for his actions**." [Joe Espy, Esq.]

- "In my conversations with Bill he has expressed **sincere regret for his actions** and he has done everything possible(including assisting the prosecution in related criminal charges) to mitigate his conduct." [Hon. J. Lee McPhearson]

- "Judge, I know Bill is **extremely remorseful** about this tragic set of circumstances.  I know because he has told me." [Everett O. Harwell, Jr.]

- "[H]e will never overcome **the regret and remorse he has for the greater harm he has done to his community and his profession.  Bill's sorrow is not that he was 'caught'doing wrong; rather, his sorrow is that he engaged in activities** that sullied the professional and governmental institutions that he respected as vehicles of good for the community." [Sonny Cauthen, Jr.]

- "Bill has accepted responsibility for his actions and expressed to me **remorse and regret** for this incident.... [H]is rehabilitation started upon his entering the guilty plea." [James A. Stephens]

- "I can testify to you that Bill feels **great remorse for what he has done**.  He is aware that he brought great embarrassment to himself and his family members.  Having once served as President of the Student Government Association at the University of Alabama, Chairman of the Democratic Party in the State of Alabama, and later as a highly respected businessman, Bill confesses the error of his way.  He has fallen hard and already suffered greatly from the consequences of his actions. [Dr. Karl K. Stegall]

- "I consider myself a close friend of Bill's.  In the past few years I have seen Bill at least twice a month and regularly since his indictment.  **He has shown a true sense of remorse for his guilt in this case**.  I know Bill has learned a hard lesson and I also know he will show the public and his friends it was and will be his last." [Michael K. Hudson]

22

The Roman philosopher Seneca noted that: "There is no person so severely punished as those who subject themselves to the whip of their own remorse."  It is clear that Bill has subjected himself to that whip.  It is also clear that Bill's remorse, expressed in each of the comments above, is for his conduct,  not for getting caught.

### B.  Grounds for Variance/Departure

As of the date of this memorandum, the Government has not filed a motion pursuant to §5K1.1 (nor is it time for the filing of such).  Such a motion is expected and should be forthcoming given Blount's substantial assistance rendered to the Government.  However, other grounds that exist for a variance/departure include the following:

### 1) The Guidelines substantially overstate Blount's culpability

Application Note 18(C) to U.S.S.G. 2B1.1 provides that "there may be cases in which the offense level determined under this guideline substantially overstates the serious of the offense.  In such cases, a downward departure may be warranted."  Several courts have noted that when the loss amount overstates the seriousness of the offense, a departure is "encouraged".  *United States v. Corry*, 206 F.3d 748, 751 (7th Cir. 2000);  *United States v. Kalili*, 100 Fed. Appx. 903, 906 (4th Cir. 2004).  To hold Bill Blount responsible for the amount of the loss/gain set forth in the PSR substantially overstates his culpability in this matter.[14]

### 2) Aberrant Behavior

Bill Blount is entitled to a variance because his conduct was aberrant behavior.  It is

---

[14] Blount adopts his arguments above that 2B1.1 is not based on the Sentencing Commission's empirical studies and therefore is due less deference because it has been imposed on the Commission by Congress.

admitted that this conduct would not qualify as a departure under the Guidelines policy statement but it should be considered by the Court as a grounds for a variance.  Blount's lifetime of charity and good works should be taken into consideration by this Court.

In *United States v. Grandmaison*, 77 F.3d 555 (1st Cir. 1996), a departure for aberrant behavior was allowed when the crime involved a scheme carried out over six months. Grandmaison was a member of his town's Board of Aldermen and he lobbied three of his alderman colleagues to award a lucrative school renovation contract to a certain construction company he was involved with, in exchange for gifts, gratuities and other things of value. Grandmaison pled guilty to honest services mail fraud and sought a aberrant behavior departure. The Government objected arguing that the departure was inapplicable because it required a single act committed with spontaneity or thoughtlessness.  The trial court agreed but was reversed by the First Circuit which held:

> We think the Commission intended the word "single" to refer to the crime committed and not to the various acts involved. As a result, we read the Guidelines' reference to "single acts of aberrant behavior" to include multiple acts leading up to the commission of a crime. ... Any other reading would produce an absurd result. The district courts would be reduced to counting the number of acts involved in the commission of a crime to determine whether departure is warranted.  Moreover, the practical effect of such an interpretation would be to make aberrant behavior departures virtually unavailable to most defendants because every other crime involves a series of criminal acts.

*Id.* at 563.  The *Grandmaison* decision has been adopted and followed in the following cases: *Zecevic v. United States Parole Comm'n*, 163 F.3d 731 (2d Cir. 1998);  *United States v. Pena*, 930 F.2d 1486, 1494-95 (10th Cir. 1991);  and *United States v. Takai*, 941 F.2d 738, 743 (9th Cir. 1991). See also, *United States v. Benally*, 215 F.3d 1068 (10th Cir. 2000) (holding that aberrance of a criminal act is an encouraged factor for departure).  Blount should be given a

24

variance because his conduct is a marked deviation from and contradicted by, not only his otherwise law-abiding life, but a life filled with actively doing good.

### 3)  Circumstances Not Adequately Taken into Consideration–§5K2.0

U.S.S.G. §5K2.0 allows the Sentencing Court to depart downward if the Court finds that there are mitigating circumstances "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines."  As noted in *United States v. Baker,* 19 F.3d 605 (11th Cir. 1994), a mitigating circumstance may justify departure even if it varies only in degree from circumstances embodied in the Guidelines.  In *United States v. Pressley,* 345 F.3d 1205 (11th Cir. 2003) and *United States v. Weaver*, 920 F.2d 1570 (11th Cir. 1991), the Eleventh Circuit granted downward departures where the collateral consequences of the prosecution provided a basis for such.[15]  Bill Blount has been ruined financially as a result of the conviction and publicity surrounding this incident.  Not only has he lost virtually all of the wealth he had accumulated, he has lost a substantial portion of his ability to earn it in the future. Accordingly, he has been sufficiently punished already.  Furthermore, his mother is in her 90s, his sons are in college and are in need of his presence.  These are circumstances not adequately taken into consideration by the Sentencing Guidelines but should be considered by this Court.

---

[15] In *Pressley* the collateral consequences resulted from pre-sentence confinement.  In *Weaver* the collateral consequences resulted from a delay in parole.

25

**Conclusion**

In conclusion, I will borrow the words of E. Ham Wilson, Jr. Esq. who stated in his letter to this Court: "I admire the fact that Bill has admitted his wrongdoing and accepted his fate.  I am hopeful that you will consider the many positive things that Bill has contributed to his family and community over the past 30 years and that your sentence will show compassion and mercy." This sentencing comes before the Court in a unique case involving unique circumstances.  Long ago Plato wrote, "[w]e should exhibit to the judges... the outline and form of the punishment to be inflicted....  But when a state has good courts, and the judges are well trained and scrupulously tested, the determination of the penalties or punishments which shall be inflicted on the guilty may fairly and with advantage be left to them."  Plato, <u>Laws</u> Part 11 (380 B.C.) (Translated by Benjamin Jowett).  The unique facts and circumstances of this case justify a sentence of a minimal period of imprisonment, the forfeiture of $1 million and whatever conditions this Court might deem appropriate.

Respectfully submitted

_____/s/ David McKnight_____
David McKnight
Attorneys for Bill Blount
BAXLEY, DILLARD, DAUPHIN, MCKNIGHT &
        JAMES
2008 Third Avenue South
Birmingham, AL  35233
Telephone: (205)271-1100
Fax: (205)271-1108

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that a true and correct copy of the foregoing Motion was served this the 19th of February, 2010 by hand delivery to the Judge and Clerk and to U.S. Attorney  by e-mail. This has not been filed electronically as it awaits the ruling of the Court on the Motion to Seal certain portions and attachments.


        /s/ David McKnight
      Of Counsel

27

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **VS.** | ) | **CRIMINAL NO. 08-cr-245-LSC-PWG** |
| | ) | |
| **WILLIAM B. BLOUNT** | ) | |
| | ) | |
| **Defendant.** | ) | |

**EXHIBIT A TO
SENTENCING MEMORANDUM OF WILLIAM B. BLOUNT:**

**<u>APPENDIX: PORTIONS OF MEMORANDUM SOUGHT TO BE SEALED</u>**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **VS.** | ) | **CRIMINAL NO. 08-cr-245-LSC-PWG** |
| | ) | |
| **WILLIAM B. BLOUNT** | ) | |
| | ) | |
| **Defendant.** | ) | |

**EXHIBIT B TO**
**SENTENCING MEMORANDUM OF WILLIAM B. BLOUNT:**

**LETTERS SUBMITTED ON BEHALF OF DEFENDANT**